Filed 4/23/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GUIVINI GOMEZ,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE REGENTS OF THE<br>UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | D077181<br><br><br><br>(Super. Ct. No. 37-2019-<br>00030873-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E. L. Strauss, Judge.  Affirmed.

Law Office of Kevin T. Barnes, Kevin T. Barnes, Gregg Lander; Sansanowicz Law Group, Leonard H. Sansanowicz; Davtyan Law Firm and Emil Davtyan for Plaintiff and Appellant.

Reed Smith, Raymond A. Cardozo and Brian A. Sutherland for Defendant and Respondent.

Guivini Gomez is a former employee of the Regents of the University of California (Regents).  She sued the Regents, as the named plaintiff in a purported class action, claiming the Regents failed to pay her the required minimum wage for all hours she worked.  However, she does not allege that the Regents set her hourly wage below the minimum wage as established by

California law. Instead, she contends the Regents' time-keeping procedures of rounding hours and automatically deducting 30 minute meal breaks resulted in her not receiving the minimum wage for all hours she actually worked. In addition to claiming the Regents did not pay her the minimum wage, Gomez also sought penalties under the Private Attorneys General Act of 2004, Labor Code[1] section 2698 et seq. (PAGA).

The superior court sustained the Regents' demurrer without leave to amend and entered judgment in their favor. Gomez appeals, arguing the superior court erred in concluding that the minimum wage laws do not apply to the Regents and that she could not seek penalties against the Regents under PAGA as a matter of law.

We reject these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Gomez worked for the Regents as an hourly-paid, nonexempt employee at University of California, San Diego Medical Center from February 2, 2017 to April 9, 2018. During this time, the Regents utilized "a uniform company policy and practice" to pay employees. Two facets of this practice included rounding the actual time worked ("usually down") and automatically deducting a 30-minute meal period regardless of whether an employee was actually offered or took a meal period.

On June 17, 2019, Gomez brought suit, on behalf of herself and other similarly situated individuals, against the Regents.[2] She alleged that the Regents engaged in certain payment policies that resulted in nonexempt employees, like Gomez, receiving less than minimum wage for the hours

_____

[1] Statutory references are to the Labor Code unless otherwise specified.

[2] It does not appear that a class was certified below. We address the claims in the operative complaint as they relate to Gomez only.

2

worked. Gomez averred that the Regents were liable, under sections 1194 and 1197, "for the unpaid balance of the full amount of the unpaid minimum wages owed." Gomez also sought civil penalties under PAGA for the Regents' violation of section 1194.

The Regents demurred to the complaint, arguing the first cause of action for failure to pay minimum wage for all hours worked was barred as a matter of law because the Regents are exempt from statutes and regulations that govern wages and benefits of public employees. The Regents further contended Gomez's claim under PAGA was barred because: (1) it is derivative of the minimum wages claim; (2) the Labor Code only applies to employees in the private sector unless the provision specifically states it applies to public employees; and (3) the Regents are exempt under Government Code section 818.

Gomez opposed the demurrer, asserting that minimum wage laws apply to all workers employed in California, without limitation, and such laws are an exercise of the state's police powers and concern a matter of statewide concern. In so arguing, Gomez urged the superior court to follow *Marquez v. City of Long Beach* (2019) 32 Cal.App.5th 552 (*Marquez*). Gomez also maintained that PAGA applied to the Regents, and Government Code section 818 did not provide the Regents any exemption from civil penalties.

The superior court sustained the Regents' demurrer without leave to amend. In doing so, the court found that the instant matter was analogous to *Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160 (*Kim*), in which the appellate court concluded the Regents could not be liable for failing to pay their employees overtime pay. (*Id.* at p. 167.) The superior court observed: "[T]here is no reasonable or meaningful distinction between overtime and minimum wage requirements [that] would support a diversion

3

from the holding in *Kim*." The superior court further found the Regents were exempt from PAGA under Government Code section 818.

Gomez timely appealed the amended judgment.

DISCUSSION

I

DEMURRER

A. Standard of Review

"On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo:  we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." (*Stearn v. County of San Bernardino* (2009) 170 Cal.App.4th 434, 439.) We evaluate whether a cause of action has been stated under any legal theory.  (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 637 (*Curcini*).)  In making our determination, we admit all facts properly pleaded (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967); we " 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38).  We read the allegations "in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties." (*Venice Town Council v. City of L.A.* (1996) 47 Cal.App.4th 1547, 1557.)

4

If the pleading is insufficient on any ground specified in a demurrer, we will uphold the order sustaining it, even if it is not the ground relied upon by the trial court.[3]  (*Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992, 998.)

## B.  The Minimum Wage Claim

### 1.  Gomez's Contentions

Gomez's first cause of action involves allegations that the Regents' time-keeping procedures of rounding hours worked and automatically deducting 30-minute meal breaks resulted in her receiving less than minimum wage for all the hours that she worked.  She claims the Regents violated sections 1194[4] and 1197.[5]  Although the complaint only mentions wage orders in general, on appeal, Gomez makes clear she believes Wage Order No. 4-2001 (Wage Order No. 4) applies to the Regents.  Underlying

---

[3]    Typically, we review the superior court's refusal to grant leave to amend under the abuse of discretion standard.  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)  However, in the instant matter, Gomez does not argue that she can allege additional facts to state a valid cause of action against the Regents.  As such, we do not address this issue.  (See *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349; *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1491.)

[4]    Section 1194, subdivision (a) states: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."

[5]    Section 1197 provides: "The minimum wage for employees fixed by the commission or by any applicable state or local law, is the minimum wage to be paid to employees, and the payment of a lower wage than the minimum so fixed is unlawful.  This section does not change the applicability of local minimum wage laws to any entity."

Gomez's first cause of action is her assertion that minimum wage laws apply to the Regents.

### 2. Wage Order No. 4

The Industrial Welfare Commission (IWC) was created in 1913 with express authority to adopt regulations—called wage orders—governing wages, hours, and working conditions in the state of California. (Stats. 1913, ch. 324, § 6, pp. 634-635; see *Martinez v. Combs* (2010) 49 Cal.4th 35, 52-57.) These wage orders, being the product of quasi-legislative rulemaking under a broad delegation of legislative power, are entitled to great deference, and they have the dignity and force of statutory law. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1027.) The Legislature's authority to delegate its legislative power to the IWC is expressly recognized in the state's Constitution. (*Martinez*, at pp. 60-61.) The Legislature can enact statutes that supersede the wage orders, but courts must seek to harmonize IWC wage orders with statutes to the extent possible. (*Brinker*, at p. 1027.)

Wage Order No. 4, which is at issue here, governs wages, hours, and working conditions in professional, technical, clerical, mechanical, and similar occupations. (See Cal. Code Regs., tit. 8, § 11040, subd. 1.) Among other things, Wage Order No. 4 includes a minimum wage section (Section 4), which requires employers to pay their employees at not less than a designated hourly rate "for all hours worked." (Cal. Code Regs., tit. 8, § 11040, subd. 4(A).) Gomez asserts this portion of Wage Order No. 4 applies to the Regents. Not surprisingly, the Regents argue it does not.

### 3. The Regents

"The California Constitution establishes the Regents as a 'public trust . . . with full powers of organization and government.' (Cal. Const.,

6

art. IX, § 9, subd. (a).)"[6] (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320.) "The authority granted the Regents includes 'full powers of organization and government, subject only to such legislative control as may be necessary to insure compliance with the terms of the endowment of the University and the security of its funds.' [Citation.] Thus, '[t]he Regents have been characterized as "a branch of the state itself" [citation] or "a statewide administrative agency" [citation]' [citation], and '[i]t is apparent that the Regents as a constitutionally created arm of the state have virtual autonomy in self-governance' [citation]. Therefore, '[t]he Regents [have] the general rule-making or policy-making power in regard to the University [citation], and [are] . . . fully empowered with respect to the organization and government of the University.' " (*Id*. at pp. 320-321.) The Regents have "general immunity from legislative regulation." (*San Francisco Labor Council v. Regents of the Univ. of Cal.* (1980) 26 Cal.3d 785, 788 (*Labor Council*).)

The Regents, however, are not entirely autonomous. The Legislature may regulate the Regents' conduct in three areas. "First, the Legislature is vested with the power of appropriation, preventing the [R]egents from compelling appropriations for salaries." (*Labor Council*, *supra*, 26 Cal.3d at p. 789.) "Second, it is well settled that general police power regulations

---

[6] "The University of California was originally a corporation, with the Regents as its board of directors. (Stats. 1867-1868, ch. 244, p. 248 [Organic Act of 1868].) During the first decade of the University's existence, controversy arose among political factions seeking to control the University's governance and curriculum. A 'decisive battle' was waged in the constitutional convention of 1879, culminating in the adoption of article IX, section 9 and the establishment of the University as a constitutionally created public trust." (*People v. Lofchie* (2014) 229 Cal.App.4th 240, 248, fn. 5 (*Lofchie*).)

governing private persons and corporations may be applied to the university. [Citations.] For example, workers' compensation laws applicable to the private sector may be made applicable to the university." (*Ibid.*) "Third, legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs." (*Ibid.*)

Nonetheless, "[c]ourts have consistently held the Regents are exempt from statutes regulating the wages and benefits of employees and other workers, including those pertaining to prevailing wages, overtime pay, and indemnification for the cost of work uniforms and maintenance, on the ground those matters are internal affairs of the university that do not come within any of the exceptions to constitutional immunity." (*Goldbaum v. Regents of University of California* (2011) 191 Cal.App.4th 703, 706 (*Goldbaum*); see *Labor Council, supra,* 26 Cal.3d at p. 788; *Regents of University of California v. Aubry* (1996) 42 Cal.App.4th 579, 587-588 (*Aubry*); *Kim, supra,* 80 Cal.App.4th at p. 167; *In re Work Uniform Cases* (2005) 133 Cal.App.4th 328, 344.)

In *Labor Council, supra,* 26 Cal.3d 785, the plaintiffs brought a writ proceeding to compel the Regents to fix salary rates for certain university employees at or above the prevailing wage rates for specified localities under

Education Code section 92611,[7] which the Legislature enacted solely to apply to the Regents. (*Labor Council*, at p. 787.) Our high court concluded the statute was unconstitutional because it "cannot be brought within any of the three categories" in which the Regents are subject to legislative regulation. (*Id.* at p. 789.) The court explained Education Code section 92611 could not be "construed as a general regulation pursuant to the police power applicable to private individuals and corporations," and "a prevailing wage requirement is not a matter of statewide concern." (*Labor Council*, at p. 790.) In reaching its conclusion, the court relied on *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 (*Sonoma County*), in which it held " 'the determination of wages paid to employees of charter cities as well as charter counties is a matter of local rather than statewide concern.' " (*Labor Council*, at p. 790.) The court elaborated that a "statute requiring payment of prevailing wages or more is effectively a salary setting statute. Public agencies' use of taxpayers' funds to pay in excess of a prevailing wage is unwarranted. . . ." (*Ibid.*) The court rejected the argument *Sonoma County* was inapplicable to the Regents, explaining "[s]alary determination is as important to the autonomy of the university as it is to the independence of chartered cities and counties." (*Labor Council*, at p. 791.)

---

7    Education Code section 92611 provides: "The minimum and maximum salary limits for laborers, workmen, and mechanics employed on an hourly or per diem basis need not be uniform throughout the state, but the [R]egents shall ascertain, as to each such position, the general prevailing rate of such wages in the various localities of the state. [¶] In fixing such minimum and maximum salary limits within the various localities of the state, the [R]egents shall take into account the prevailing rates of wages in the localities in which the employee is to work and other relevant factors, and shall not fix the minimum salary limits below the general prevailing rate so ascertained for the various localities."

In *Aubry*, *supra*, 42 Cal.App.4th 579 at pages 587 through 588, the court, citing language from *Labor Council*, held the Regents were not required to pay private contractors the prevailing wage under section 1770 et seq., which applies to public works, for the construction of student and staff housing. The court rejected the argument that the matter was one of statewide concern applicable to the Regents because the projects "involve internal UC affairs vital to its core educational function." (*Aubry*, at p. 591.) The court explained: "Ensuring access to qualified students who otherwise could not attend, and securing the services of outstanding faculty and staff who otherwise might decline to accept or continue employment, is at the heart of UC's educational function, as is giving those students who do attend the best education possible." (*Id.* at p. 590.) The court also noted the "prevailing wage law is not universally applied." (*Ibid.*)

In *In re Work Uniform Cases*, *supra*, 133 Cal.App.4th at page 338, the court held the Regents are constitutionally immune from the reach of section 2802, which pertains to an employer's obligation to indemnify an employee for necessary expenses and losses incurred in discharging job duties.[8] Specifically at issue was whether the statute required employers to pay for work uniforms and their maintenance. Concerning the Regents, the court explained: "Even if section 2802 had some application to reimbursement for ordinary costs related to employee uniforms, that interpretation would not bring it within the narrow group of three areas in

---

[8] Section 2802, subdivision (a) provides: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be lawful."

10

which the Regents are subject to legislative regulation. Section 2802 is not an appropriations statute or a general police power regulation. . . . [I]t does not relate to a matter of statewide concern in the context in which plaintiffs seek to have it applied. To the contrary, the determination of employee compensation and benefits is particularly a matter within the Regents' broad constitutional grant of authority to manage [their] own internal affairs." (*In re Work Uniform Cases*, at p. 344.)

Below, the superior court relied on *Kim*, *supra*, 80 Cal.App.4th 160, in which the court held the Regents are constitutionally immune from liability under section 1194 for the payment of overtime wages. (*Kim*, at p. 166.) The court explained: "The logic of *Labor Council* and *Aubry* applies equally to Kim's state overtime claim. Payment of overtime wages is not an appropriation bill or a general regulation pursuant to police powers applicable to private individuals and corporations. Like *Aubry* and *Labor Council*, the issue here pertains to the determination of the amount of wages to be paid to individual employees. *Aubry* held that the prevailing wage law was not such a matter of statewide concern as to outweigh the ability of the university to pay lower wages to advance its educational objectives. [Citation.] The issue of overtime wages is much the same." (*Kim*, at p. 167, fn. omitted.)[9]

None of the above discussed cases directly address the issue before us: whether the Regents are subject to California minimum wage laws. Or, more specifically, whether such laws can penetrate the Regents' autonomy

---

[9]    In addition, this court concluded that a Labor Code statute mandating an award of attorney fees and costs to the prevailing party in an action related to pension fund eligibility, unpaid wages, or fringe benefits did not apply to the Regents. (See *Goldbaum*, *supra*, 191 Cal.App.4th at pp. 706-707.)

11

regarding the setting of wages and benefits for employees where the challenged practices concern internal time-keeping. Nevertheless, the superior court determined the instant matter was analogous to *Kim*, *supra*, 80 Cal.App.4th 160 in sustaining the Regents' demurrer without leave to amend. Gomez maintains such a conclusion was incorrect.

4. Analysis

Gomez devotes a substantial amount of her opening brief attempting to distinguish *Kim*. To this end, she points out that overtime wages are different than minimum wages. Gomez observes that Wage Order No. 4 expressly excludes public employees from overtime wage requirements. (See Cal. Code Regs., tit. 8, § 11040, subd. 1(B).) Thus, according to Gomez, the court in *Kim* had clear statutory guidance that the overtime wage requirements did not apply to the Regents. However, Gomez's argument overlooks the fact the plaintiff in *Kim* argued the subject wage order did not apply to her because she was not employed directly by the state. Rather, the plaintiff argued that her employer, the Regents, were a different type of entity altogether. (See *Kim*, *supra*, 80 Cal.App.4th at p. 166.) Thus, the court in *Kim* did not address whether Wage Order No. 4 applied to the Regents but, instead, followed the reasoning of *Labor Council* and *Aubry* in determining the plaintiff did not have a valid state law claim against the Regents. (*Kim*, at p. 167.) At most, the court made a passing reference to Wage Order No. 4 at the end of its analysis of the plaintiff's state law claim. "Moreover, the fact that the IWC regulation exempts professionals and all state, county and municipal employees from its overtime order indicates that the regulation is not *generally* applicable to private persons and corporations and that at least with respect to the determination of wages to be paid by public entities—is not a matter of statewide concern." (*Kim*, at p. 167.)

12

Despite Gomez's focus on Wage Order No. 4's express exclusion of overtime regulations applying to public entities, the court in *Kim* did not rely on that order as a primary basis for its conclusion.

Gomez also emphasizes that seven months after the opinion in *Kim* was issued, the IWC promulgated a wage order indicating that minimum wage requirements apply to public employees. (See Cal. Code Regs., tit. 8, § 11040, subd. 1(B) ["Except as provided in Sections 1, 2, 4, 10, and 20, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district."].)  Gomez argues that this exclusionary language makes clear that Section 4 applies to public entities, like the Regents.  Therefore, Gomez maintains *Kim* is irrelevant in determining whether the minimum wage requirements apply to the Regents.

The Regents counter that subdivision 1(B) of Wage Order No. 4 does not apply to them as it only refers to the state and the state's political subdivisions.  Implicit in the Regents' argument is that they are not a political subdivision.  Consistent with this contention, the Regents also point us to section 1182.12, which sets forth the actual minimum wage required under state law, and emphasize that the definition of "employer" in that statute does not explicitly refer to the Regents, but does provide:  "For purposes of this subdivision, 'employer' includes the state, political subdivisions of the state, and municipalities."  (§ 1182.12, subd. (b)(3).)  Again, the Regents underscore that they are not specifically named in the statute and assert the phrase "political subdivision" does not include them.  However, section 1182.12 does not definitively address whether the Regents or the University of California are a political subdivision of California for purposes of Wage Order No. 4.

13

The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645.) In determining the intent of the Legislature, we first examine the words of the statute itself. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698.) If the language of the statute is clear and unambiguous, there is no need for statutory construction. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) However, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose." (*Ibid*.) " 'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*People v. Coronado* (1995) 12 Cal.4th 145, 151.) The legislative purpose "will not be sacrificed to a literal construction" of any part of the statute. (*Select Base*, at p. 645.)

Here, the subject language states Section 4 of Wage Order No. 4 "shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district." (See Cal. Code Regs., tit. 8, § 11040, subd. 1(B).) The use of the word "including" makes clear that the listing of "any city, county, or special district" is not exhaustive of what may constitute a political subdivision. Yet, the fact that the list is not exhaustive does not necessarily lead to the conclusion that the Regents are a political subdivision for purposes of this wage order. And Wage Order No. 4 provides no definition of "political subdivision." As there are no cases addressing the application of Wage Order No. 4 to the Regents, it is not surprising that no court has determined whether the Regents are a political

14

subdivision of the state for purposes of Wage Order No. 4. The parties have not provided any authority supporting their respective positions that the Regents should or should not be considered a political subdivision of the state. However, our independent research uncovered at least one case that determined that the University of California is not a political subdivision, albeit in the context of another statute but still involving a University employee nonetheless. (See *Lofchie, supra*, 229 Cal.App.4th at p. 254.)

In *Lofchie*, the appellate court concluded that a University faculty member could not be criminally prosecuted under Government Code section 1090 for participating in a decision to hire his wife as a program assistant for a four-week study abroad course.[10] (*Lofchie, supra*, 229 Cal.App.4th at p. 245.) As part of its analysis, the court noted that there was no case law applying Government Code section 1090 to the University of California or its employees. The People argued that a case involving an elected member of the Los Angeles Board of Education (*People v. Darby* (1952) 114 Cal.App.2d 412, 423 (*Darby*)) and a case involving members of the City of Los Angeles School Board (*People v. Elliott* (1953) 115 Cal.App.2d 410, 415 (*Elliott*)) supported their argument that the University is the "state" and the University employee is a "state employee" within the meaning of

---

[10] Government Code section 1090 provides: "(a) Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity. [¶] . . .[¶] (c) As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

15

Government Code section 1090.  (*Lofchie*, at p. 253.)  In concluding that *Darby and Elliott* were not instructive, the court reasoned:

> "Unlike the City of Los Angeles in *Darby* and *Elliott*, the University of California is not a political subdivision of the state invested with a portion of the state's governmental power—it is a public trust.  (Cal. Const., art. IX, § 9.)  The purpose of designating the University as a public trust was to insulate it from state government, ensuring that the University and its faculty would be 'entirely independent of all political or sectarian influence.'  (Cal. Const., art. IX, § 9, subd. (f).)  Our Supreme Court has recognized the 'unique constitutional status of the University of California' (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 889 [80 Cal. Rptr. 3d 690, 188 P.3d 629]), distinguishing it from other state agencies that are subject to the Legislature's comprehensive power of regulation."

(*Lofchie*, at p. 254.)

Thus, the court in *Lofchie* drew a distinction between a city and the University of California, specifically concluding that a city is a political subdivision of the State of California but the University of California is not.  It is different.  "[I]t is a public trust."  (*Lofchie*, *supra*, 229 Cal.App.4th at p. 254.)  And the Regents are a public corporation that administers that trust.  (Cal. Const., art IX, § 9, subd. (a); *Lofchie*, at p. 248.)

We agree with the court in *Lofchie* that the Regents generally are not considered a political subdivision.[11]  Moreover, in Wage Order No. 4, there is nothing in the words of the regulation itself that leads us to believe that the phrase "political subdivision" was intended to include the Regents.  Indeed, the examples of political subdivisions set forth in the wage order "city," "county," and "special district" are not entities similar to the Regents.  (See Cal. Code Regs., tit. 8, § 11040, subd. 1(B).)  Rather, they are like the entities involved in *Darby* and *Elliott* that the court found were unlike the Regents.  (*Lofchie*, *supra*, 229 Cal.App.4th at pp. 253-254.)

Also, Wage Order No. 4 defines "employer" and does not refer to the Regents in the definition.  The wage order provides, "[e]very employer shall pay to each employee, on the established payday for the period involved, not less than the applicable wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise."  (Cal. Code Regs., tit. 8, § 11040, subd. 4(B).)  The wage order further states that an "employer" is "any person as defined in Section 18 of

---

[11]  We observe several statutes' definitions of "political subdivision" do not appear to include the Regents or the University of California.  (See, e.g., Elec. Code, § 14051, subd. (a); Gov. Code, § 8698, subd. (a); Lab. Code, § 1721.)  However, we understand that these statutes are for a specific purpose, unrelated to Wage Order No. 4.  That said, we note that in certain statutes, the Legislature has made clear that the University of California is to be considered a public subdivision in a particular context, like when prosecuting false claim actions.  (See Gov. Code, § 12652.5 ["Notwithstanding any other provision of law, the University of California shall be considered a political subdivision, and the General Counsel of the University of California shall be considered a prosecuting authority for the purposes of this article, and shall have the right to intervene in an action brought by the Attorney General or a private party or investigate and bring an action, subject to Section 12652, if it is determined that the claim involves the University of California"].)  Such clarity and specificity does not appear in Wage Order No. 4 or the applicable provisions of the Labor Code relevant here.

17

the Labor Code" who exercises control over work. (Cal. Code Regs., tit. 8, § 11040, subd. 2(H).) Section 18 defines "person" to mean "any person, association, organization, partnership, business trust, limited liability company, or corporation." (§ 18.) Neither the Regents nor the University of California is any of these entities. The University is a public trust, not a business trust as set forth in section 18. In turn, the Regents are a constitutional public entity, not a private corporation formed under the Corporations Code. (Cf. *Newmarker v. Regents of University of Cal.* (1958) 160 Cal.App.2d 640, 645 [rejecting the plaintiffs' argument that they were employees of a "private corporation"]; *Regents of Univ. of Cal. v. Superior Court* (1970) 3 Cal.3d 529, 541-542 [concluding the Regents are not a corporation for purposes of venue].)

Even if we remain unpersuaded that neither the Labor Code nor Wage Order No. 4 clearly establishes that the minimum wage laws apply to the Regents, Gomez argues that minimum wage laws fall under the Legislature's police powers and are a matter of statewide concern. As such, she maintains minimum wage laws must apply to the Regents. (Cf. *Labor Council*, *supra*, 26 Cal.3d at p. 789.) In support of her position, she contends we should follow *Marquez*, *supra*, 32 Cal.App.5th 552, emphasizing that the court in that case concluded the minimum wage requirements in Wage Order No. 4 apply to public employees. (*Marquez,* at p. 569.) Yet, Gomez's assertion overstates the conclusion of the appellate court in *Marquez*.

In *Marquez*, the appellate court addressed whether charter cities must comply with state law minimum wage orders.[12] (See *Marquez, supra,* 32

---

[12] "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555 (*City of Vista*).)

Cal.App.5th at pp. 556-557.) There, a charter city paid certain nonexempt, hourly employees less than minimum wage. (*Id*. at p. 558.) The superior court sustained the charter city's demurrer without leave to amend. The plaintiffs appealed the ensuing judgment. (*Ibid*.)

The appellate court evaluated the charter city's claim to home rule authority[13] over its municipal affairs—including its " 'plenary authority' [citation] to provide for the compensation of city employees" as set forth in the state constitution. (*Marquez, supra*, 32 Cal.App.5th at p. 557.) In doing so, the court applied the four-part test set forth by the California Supreme Court in *City of Vista, supra*, 54 Cal.4th at page 556.[14] "First, a court must determine whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.' [Citation.] Second, the court 'must satisfy itself that the case presents an actual conflict between [local and state law].' [Citation.] Third, the court must decide whether the state law addresses a matter of 'statewide concern.' [Citation.] Finally, the court must determine whether the law is 'reasonably related to . . . resolution' of that concern [citation] and 'narrowly tailored' to avoid unnecessary interference in

---

[13] The "constitutional 'home rule' doctrine reserves to charter cities the right to adopt and enforce ordinances that conflict with general state laws, provided the subject of the regulation is a 'municipal affair' rather than one of 'statewide concern.' " (*Traders Sports v. City of San Leandro* (2001) 93 Cal.App.4th 37, 45.)

[14] Our high court in *City of Vista* explained that the test originated in *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 at pages 16 through 17 (*California Fed. Savings*) wherein the court "set forth an analytical framework for resolving whether or not a matter falls within the home rule authority of charter cities." (*City of Vista, supra*, 54 Cal.4th at p. 556.)

local governance [citation]."[15] (*City of Vista*, at p. 556.) In answering this four-part test in favor of enforcing the minimum wage law against the charter city, the appellate court emphasized that "the express terms of" the subject wage orders (one of which was Wage Order No. 4) make their minimum wage provisions applicable to " 'any city.' " (*Marquez*, at p. 569, citing Cal. Code Regs., tit. 8, § 11040, subd. 1(B).)

The appellate court differentiated the substantive nature of minimum wage regulations from that of the prevailing wage law addressed in *City of Vista, supra*, 54 Cal.4th at pages 564 to 565 [drawing a distinction between "a minimum wage law of broad general application" and a prevailing wage law] and *Labor Council, supra*, 26 Cal.3d at page 790 [holding prevailing wage law did not apply to the Regents but observing "[p]revailing wage regulations are substantially different from minimum wage statutes"]. (*Marquez, supra*, 32 Cal.App.5th at p. 574.) It explained that "a prevailing wage law has a greater impact on local control . . . because by requiring payment of wages prevailing in an industry locally, the law is 'effectively a salary setting statute,' " whereas the minimum wage requirement "does not effectively determine the wage for all employment relationships it regulates, but rather, sets as a floor the lowest permissible hourly rate of compensation." (*Ibid.*) The court also likened the statewide minimum wage requirement to the statewide workers' compensation scheme, noting that they both serve "the fundamental purpose of protecting the health and welfare of workers." (*Id.* at p. 573.)

---

[15] "If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited by article XI, section 5(a) [of the California Constitution], from addressing the statewide dimension by its own tailored enactments." (*California Fed. Savings, supra*, 54 Cal.3d at p. 17.)

We determine *Marquez*, *supra*, 32 Cal.App.5th 552 is not instructive here.  The Regents are not a charter city like the defendant in *Marquez*.  (Cf. *Lofchie*, *supra*, 229 Cal.App.4th at pp. 253-254.)  Further, unlike the charter city in *Marquez*, the Regents are not a type of entity specifically listed in Wage Order No. 4.  Also, unlike the defendant in *Marquez*, there are no allegations that the Regents set the hourly rate for any nonexempt employee below the minimum wage.  Instead, Gomez challenges internal time-keeping procedures utilized by the Regents, not the setting of a substandard minimum wage.  (See *Marquez*, *supra*, 32 Cal.App.5th at p. 570 ["the City's enactment setting subminimum wages conflicts with the state's minimum wage requirements"].)

In the instant matter, Gomez is urging us to expand the holding of *Marquez* and apply it beyond charter cities to a completely different type of public entity.  However, she has not provided any case wherein a court applied the four-part test set forth in *California Fed. Savings*, *supra*, 54 Cal.3d 1 to an entity other than a charter city.  Our independent research has found none.  Nevertheless, in a footnote in her opening brief, Gomez argues the differences between a charter city and the Regents are inconsequential.  (See *Curcini*, *supra*, 164 Cal.App.4th at p. 643 ["California courts have applied interchangeably the reasoning from cases involving one type of entity to cases involving the other in the context of the constitutional delegation of issues of employee compensation"].)  Gomez's argument, however, glosses over the fact that the cases relied on by *Curcini* involve upholding a public entity's exclusive power under the California Constitution to determine the compensation of its employees.  (See *Curcini*, at pp. 643, 645 [determining that Labor Code sections pertaining to overtime and meal and rest breaks did not apply to a charter county]; *Kim*, *supra*, 80 Cal.App.4th at

21

p. 167 [overtime claim under Labor Code did not apply to the Regents]; *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 282 [invalidating law requiring counties and other local agencies to submit, under certain circumstances, to binding arbitration of economic issues arising during negotiations with unions representing firefighters or law enforcement officers]; *Sonoma County*, *supra*, 23 Cal.3d at p. 302 [finding unconstitutional a statute "prohibit[ing]" the distribution of certain state funds to local public agencies that granted their employees cost-of-living increases, despite a legislative declaration that the statute was a matter of statewide concern]; *Labor Council*, *supra*, 26 Cal.3d at pp. 787, 789 [concluding Regents need not comply with an Education Code provision requiring the Regents to pay certain employees at or above the local prevailing wage rates].)  The common thread through each of these cases is that the courts were finding legislation invalid when that legislation infringed upon a public entity's constitutional right to determine its employees' compensation.  None of the cases involved a court applying constitutional limits found to apply to one entity to another type of entity.  Indeed, a case on which Gomez relies in her opening brief cautions against such an extension, *Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289 (*Sheppard*).

In *Sheppard, supra,* 191 Cal.App.4th 289 at page 294, the appellate court concluded that minimum wage provisions of an IWC wage order applied to an employee of a regional occupational program established by public school districts.  The court determined that the plaintiff alleged that he was employed directly by a political subdivision of the state because his employer was established by one or more school districts under Education Code

22

section 52301.[16] (*Sheppard*, at p. 301.) The court further observed that Wage Order No. 4 applied to " 'all persons employed in professional, technical, clerical, mechanical, and similar occupations . . . .' " and stated: " 'Except as provided in Section[] . . . 4 . . . , the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.' " (*Sheppard*, at p. 300.) Because Wage Order No. 4 referred to Section 4 as an express exception to its general statement that the order did not apply to employees of the state or political subdivisions of the state, the court interpreted the language of the wage order "by its terms, to impose the minimum wage provisions as to all employees in the occupations described therein, including employees directly employed by the state or any political subdivision of the state." (*Sheppard*, at pp. 300-301.) However, in determining that the minimum wage law applied to the specific public entity at issue, the court acknowledged the limitations of its holding. It explicitly noted that it found no constitutional authority limiting the Legislature's ability to authorize the IWC to apply the minimum wage law provision contained in Wage Order No. 4 to public school districts but cautioned that "the Legislature would be further limited by article IX, section 9 of the California Constitution addressing the University of California." (*Sheppard*, at p. 310, fn. 13; *id.* at p. 310.) Thus, the court in *Sheppard* recognized its analysis did not directly apply to the Regents without consideration of the

---

[16] Education Code section 52301, subdivision (a)(1) provides in part: "The county superintendent of schools of each county, with the consent of the state board, may establish and maintain, or with one or more counties may establish and maintain, a regional occupational center, or regional occupational program, in the county to provide education and training in career technical courses."

Regents' unique constitutional status. In other words, *Sheppard* is not helpful in the instant action.

In short, on the unique facts before us, we decline to extend *Marquez*, *supra*, 32 Cal.App.5th 552 and *Sheppard*, *supra*, 191 Cal.App.4th 289 to the claims Gomez alleged against the Regents. Here, Gomez has not alleged the Regents set her hourly pay below the minimum wage. Instead, she challenged certain time-keeping procedures the Regents employ. In light of California courts' consistent deference to the Regents regarding the setting of wages and benefits for employees (see *Labor Council*, *supra*, 26 Cal.3d at p. 788; *Aubry*, *supra*, 42 Cal.App.4th at pp. 587-588; *Kim*, *supra*, 80 Cal.App.4th at p. 167; *In re Work Uniform Cases*, *supra*, 133 Cal.App.4th at p. 344), we conclude the superior court did not err in sustaining the demurrer without leave to amend as to the first cause of action. The Regents' time-keeping procedures are matters of internal affairs of the university that do

not come within any of the exceptions to the Regents' constitutional immunity.[17]

## C.  PAGA

Having concluded that the superior court did not err in sustaining the Regents' demurrer as to the first cause of action, we turn to Gomez's second cause of action wherein she sought penalties under PAGA.  As we explain *post*, Gomez's claim under PAGA is derivative of her first cause of action.  Because the first cause of action cannot stand against the Regents, Gomez's PAGA claim necessarily fails.

---

[17]    We grant Gomez's request that we take judicial notice of a letter from the Division of Labor Standards Enforcement (DLSE) dated April 25, 2001 (2001 DLSE Letter).  "The DLSE 'is the state agency empowered to enforce California's labor laws, including IWC wage orders.' " (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581.)  The DLSE's opinion letters, " ' " 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " ' " (*Seymore v. Metson Marine, Inc.* (2011) 194 Cal.App.4th 361, 369, fn. 5; see *Morillion*, at p. 584 [relying on DLSE opinion letters to inform its interpretation of the IWCs wage orders].)  The 2001 DLSE Letter addressed whether Education Code section 67706.2 exempted the California State University from the obligation to pay its employees minimum wage.  The DLSE answered this question in the negative.  However, the letter did not specifically address the Regents or the University of California.  And, in contrast to the Regents, the California State University "is subject to full legislative control, and has 'only such autonomy as the Legislature has seen fit to bestow.' " (*Native American Heritage Com. v. Board of Trustees* (1996) 51 Cal.App.4th 675, 684, quoting *Slivkoff v. Board of Trustees* (1977) 69 Cal.App.3d 394, 401.)  Although we grant the request for judicial notice, the 2001 DLSE Letter does not impact our analysis.  In addition, Gomez submitted a second request for judicial notice asking us to take judicial notice of two charts from two different websites purporting to show employment statistics pertaining to the University of California.  We decline to do so.  (See *Searles Valley Minerals Operations, Inc. v. State Bd. Of Equalization* (2008) 160 Cal.App.4th 514, 519.)

"In September 2003, the Legislature enacted [PAGA] (Lab. Code, § 2698 et seq., Stats. 2003, ch. 906, § 2, eff. Jan. 1, 2004). The Legislature declared that adequate financing of labor law enforcement was necessary to achieve maximum compliance with state labor laws, that staffing levels for labor law enforcement agencies had declined and were unlikely to keep pace with the future growth of the labor market, and that it was therefore in the public interest to allow aggrieved employees, acting as private attorneys general, to recover civil penalties for Labor Code violations, with the understanding that labor law enforcement agencies were to retain primacy over private enforcement efforts. (Stats. 2003, ch. 906, § 1.)" (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980 (*Arias*).)

"Under this legislation, an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations. (Lab. Code, § 2699, subd. (a).) Of the civil penalties recovered, 75 percent goes to the Labor and Workforce Development Agency, leaving the remaining 25 percent for the 'aggrieved employees.' ([Lab. Code, § 2699, subd. (i)].)" (*Arias, supra,* 46 Cal.4th at pp. 980-981, fn. omitted.)

An employee may only seek civil penalties under PAGA if he or she is aggrieved. An "aggrieved employee" is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." (§ 2699, subd. (c).) Because we have determined that Gomez cannot maintain her first cause of action against the Regents, the Regents cannot be considered a violator under PAGA, and Gomez is not the victim of any violation. Therefore, the second cause of action under PAGA fails.

DISPOSITION

The judgment is affirmed. The Regents are entitled to their costs on appeal.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.

27